**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250157-U

Order filed August 14, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-25-0157 Circuit No. 20-CF-23 |
| | ) | |
| RICHARD H. PROCTOR, | ) ) | Honorable Kenneth L. Zelazo, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HETTEL delivered the judgment of the court.
Justices Holdridge and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The admission of evidence that defendant solicited the murder of a witness was not unduly prejudicial.

¶ 2    Defendant, Richard H. Proctor, appeals his conviction for first degree murder, arguing he was denied a fair trial based on the Will County circuit court's erroneous admission of prejudicial other-crimes evidence. We affirm.

¶ 3                                I. BACKGROUND

¶ 4　　　In January 2020, defendant was charged by indictment with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)). The charges were based on the allegation that defendant stabbed his friend, Ryan Connell, with a knife, causing his death. In September 2023, the court granted defendant's request to proceed *pro se* and appointed the public defender as stand-by counsel.

¶ 5　　　Prior to trial, the State filed a motion *in limine* to admit other-crimes evidence that defendant solicited Charles Miceli and Andrew Karceski to kill his girlfriend, Hannah Kuckuck, the only eyewitness to Connell's murder. In response, defendant filed motions *in limine* to bar the introduction of bad acts evidence and evidence of any pending criminal charges against him, including a federal charge for solicitation of murder for hire. After consolidating defendant's motions and hearing arguments from the parties, the court granted the State's motion. The court denied defendant's motion in part, specifically as it related to the exclusion of bad acts evidence. The State indicated that it did not intend to disclose to the jury that defendant was facing a federal charge for soliciting Kuckuck's murder. The court granted defendant's motion to bar evidence of any other criminal charges.

¶ 6　　　At trial, the State informed the jury during opening statement that Kuckuck was unable to testify because she had died "through no fault of the defendant." The State then explained that defendant demonstrated his guilty state of mind related to Connell's murder by soliciting "an undercover federal agent to prevent [Kuckuck] from testifying about what happened."

¶ 7　　　The evidence adduced at trial established that on the morning of January 1, 2020, Connell was found deceased inside defendant's apartment. Connell had been stabbed four times in the back, causing his death. A kitchen knife with a bent and bloodstained blade was discovered

2

approximately three feet away from Connell's body. Connell had also sustained blunt force injuries to his head and arms that were consistent with being punched.

¶ 8    Connell had attended a party at defendant's apartment the night before. After the other guests had left, Connell remained inside the apartment with defendant and Kuckuck. Defendant testified that Connell started arguing with him and punching him. Defendant stated that he fought back and repeatedly punched Connell in the chest until Connell fell down. Defendant then briefly left the apartment and returned approximately two minutes later. Defendant stated that he could not remember what happened next because he was heavily intoxicated. Defendant testified that he could only recall pulling the knife out of Connell's body in an attempt to render aid as Kuckuck asked him, "what did you do?" Defendant explained that he fled from the apartment after Kuckuck said she was going to call the police and "put everything on [him] if [he] didn't leave." Defendant ran to his aunt's residence approximately a mile away and gave her the sweater he was wearing, which was stained with Connell's blood.

¶ 9    Minutes after defendant left the apartment, Kuckuck went to a nearby gas station where Seamus Porter picked her up. Porter testified that he did not see any blood on Kuckuck's clothing and she did not have any cuts or other injuries.

¶ 10    Village of Steger Deputy Police Chief Peter Fajman testified that he interviewed Kuckuck as part of his investigation into Connell's murder. Fajman confirmed that Kuckuck had passed away through no fault of defendant and a certified copy of Kuckuck's death certificate was entered into the record.

¶ 11    Miceli testified that he and defendant were housed in the same unit while incarcerated at the Will County jail. Miceli stated that he had assisted other inmates with their cases and agreed to help defendant with the instant case. Defendant provided Miceli with multiple versions of the

3

incident that implicated Kuckuck before eventually admitting he had stabbed Connell with a kitchen knife after an altercation. Defendant expressed that he wanted Kuckuck dead because it would help his case and asked Miceli, as he was nearing his release from jail and had mob affiliations, to assist him in having her killed. After notifying law enforcement, Miceli advised defendant he had a trusted friend that could kill Kuckuck and gave defendant the telephone number of an undercover federal agent. Miceli explained that in his communications with defendant, they referred to Kuckuck as defendant's dog, "Sammy."

¶ 12     Defendant subsequently began communicating with Karceski, the undercover agent. The State presented text messages and portions of the recorded calls from defendant's communications with Karceski to the jury. During their conversations, defendant suggested Karceski "check the pound" to find "Sammy" and to "use the best drugs" to "put her down." Karceski testified that "check the pound" meant to search the jails for Kuckuck to locate her. The comment about putting her down with drugs referred to killing Kuckuck by giving her a lethal dose of fentanyl. Defendant also discussed Karceski attending a concert, which was code for an alleged court date that Karceski was supposed to attend to find Kuckuck.

¶ 13     Defendant agreed to give Karceski his vehicle as a partial payment for killing Kuckuck, and Karceski obtained the keys and title to the vehicle from defendant's father. When Karceski sent a coded message to defendant about a business trip that falsely indicated he had successfully killed Kuckuck, defendant responded that he would need to "get a new dog and new ride" once he was released from custody.

¶ 14     In admonishing the jury prior to deliberations, the court provided the following instruction:

4

"Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment. This evidence has been received on the issue of the defendant's consciousness of guilt and may be considered by you only for that limited purpose.

It is for you to determine whether the defendant was involved in that offense and, if so, what weight should be given to this evidence on the issue of consciousness of guilt."

¶ 15    Defendant was found guilty and sentenced to 40 years' imprisonment.[1] After filing a *pro se* motion for a new trial, defendant requested that counsel be appointed to represent him. The court granted defendant's request and defense counsel subsequently filed a superseding motion for a new trial. The motion argued that the court erred in granting the State's motion *in limine* to admit evidence that defendant sought to have Kuckuck killed because (1) it was inadmissible propensity evidence and (2) it was more prejudicial than probative, as it exceeded the amount of detail necessary to show consciousness of guilt and negatively characterized defendant as "cold, uncaring, and willing to kill in order to save himself." The court denied the motion, finding that the probative value of the evidence outweighed any prejudicial effect.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, defendant argues that the circuit court erred in admitting evidence that he solicited others to kill Kuckuck. The admissibility of evidence, including evidence of other crimes, is within the sound discretion of the circuit court and will not be reversed absent an abuse of discretion. *People v. Chambers*, 2011 IL App (3d) 090949, ¶ 10. This standard is highly

---

[1]The counts merged at sentencing.

deferential, and error occurs only where the court's determination is so arbitrary or fanciful that no reasonable person would agree with the view adopted by the court. *People v. Rios*, 2022 IL App (1st) 171509, ¶ 58.

¶ 18    While evidence of another crime is inadmissible to show criminal propensity, it may be offered to demonstrate a defendant's guilty knowledge or consciousness of guilt. *People v. Woods*, 122 Ill. App. 3d 176, 179 (1984). Evidence that a defendant attempted to destroy incriminating evidence is always admissible to show consciousness of guilt. *People v. Abernathy*, 402 Ill. App. 3d 736, 753 (2010). Consequently, evidence that a defendant attempted to kill an eyewitness is properly admissible for this purpose. *Woods*, 122 Ill. App. 3d at 179.

¶ 19    Defendant concedes that the evidence at issue was admissible for the nonpropensity purpose of demonstrating consciousness of guilt. Rather, defendant contends that the amount of other-crimes evidence presented by the State was excessive and made the solicitation of Kuckuck's murder the focus at trial.

¶ 20    Evidence of other crimes should not become a focal point at trial. *People v. Bedoya*, 325 Ill. App. 3d 926, 938 (2001). To prevent an impermissible mini-trial of the collateral offense, the admission of other-crimes evidence should be limited to what is required to illuminate the issue for which the other crime was introduced. *People v. Smith*, 406 Ill. App. 3d 747, 755 (2010). A mini-trial of the collateral offense results from other-crimes evidence that is unrelated to the offense at issue, excessively detailed, and repetitive. *Id.*

¶ 21    Here, the evidence that defendant attempted to have Kuckuck murdered to prevent her from testifying against him had considerable probative value in that it demonstrated defendant's consciousness of guilt. See *People v. Brandon*, 197 Ill. App. 3d 866, 877 (1990). The evidence showed defendant asked Miceli to kill Kuckuck, Miceli facilitated the initial communication

6

between defendant and Karceski, and defendant made an agreement with Karceski to have Kuckuck killed. The details contained in the recorded conversations and corroborating testimony were necessary to properly understand the coded language defendant used to conceal his plan to kill Kuckuck. Without this evidence, it would have been difficult to establish defendant had taken actual steps to have Kuckuck killed. See *People v. McKibbins*, 96 Ill. 2d 176, 183 (1983) (substantial amount of detailed other-crimes evidence does not constitute prejudicial error when it would be difficult to explain or describe the other-crimes evidence for its proffered purpose). Because this evidence was imperative to illuminate the highly probative issue of defendant's consciousness of guilt, we cannot say it constituted prejudicial error. See *Woods*, 122 Ill. App. 3d at 180 (no prejudicial error when other-crimes evidence of defendant's consciousness of guilt, presented through an audio recording and undercover investigator testimony, provided a detailed account of defendant's solicitation for the murder of an eyewitness).

¶ 22       Furthermore, the record reflects that the challenged evidence was not the focal point at trial. The State's presentation of other-crimes evidence consisted of 21 exhibits and the testimony of Miceli and Karceski. This evidence was relatively minimal in the context of an eight-day trial during which the State presented a total of 13 witnesses and introduced over 170 exhibits. See *People v. Sabbs*, 2024 IL App (3d) 200439-U, ¶ 57; *People v. Carter*, 2023 IL App (1st) 200091-U, ¶ 132. Additionally, jurors were instructed at the close of the case that the evidence had been received on the issue of defendant's consciousness of guilt and should be considered only for that limited purpose. As we do not find that the evidence was excessive, the court's limiting instruction was sufficient to substantially reduce any prejudicial impact. See *People v. Young*, 381 Ill. App. 3d 595, 601 (2008).

¶ 23    In coming to this conclusion, we reject defendant's reliance on *People v. Thigpen*, 306 Ill. App. 3d 29, 37-39 (1999), *People v. Nunley*, 271 Ill. App. 3d 427, 431-33 (1995), and *People v. Bennett*, 281 Ill. App. 3d 814, 827-28 (1996), in support of his argument that the admitted evidence was too extensive. Notably, none of those cases involved other-crimes evidence demonstrating consciousness of guilt. See *Thigpen*, 306 Ill. App. 3d at 36 (other-crimes evidence admitted to show common plan or scheme); *Nunley*, 271 Ill. App. 3d at 432 (continuing narrative leading to defendant's arrest and confession); *Bennett*, 281 Ill. App. 3d at 828 (*modus operandi*). In both *Thigpen* and *Nunley*, the other-crimes evidence was overly prejudicial because it was far more grotesque than the crime at issue. *Thigpen*, 306 Ill. App. 3d at 38 (extensively detailed other-crimes evidence of double murder included photographs of the victims' corpses); *Nunley*, 271 Ill. App. 3d at 432 (other-crimes evidence that defendant had attempted to decapitate his mother and killed her dog was completely unrelated to the crime at issue and extremely inflammatory). In *Bennett*, the inadmissible other-crimes evidence was both irrelevant and its prejudicial effect outweighed any probative value because it involved an act of violence. See *Bennett*, 281 Ill. App. 3d at 828. Unlike those cases, defendant's attempt to have the eyewitness against him killed was highly relevant to show his consciousness of guilt and the details were far less gruesome and inflammatory compared to the charged offense of first degree murder, which involved Connelly being violently beaten and stabbed.

¶ 24                                    III. CONCLUSION

¶ 25    The judgment of the circuit court of Will County is affirmed.

¶ 26    Affirmed.

8